## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE:   MARGARET A. RITTER, | : | Chapter 7 |
| | : | |
| Debtor. | : | Bky. No. 07-13863 (ELF) |
| | : | |
| | : | |
| CHASE BANK USA, N.A., | : | |
| | : | |
| Plaintiff, | : | Adv. No. 07-00323 (ELF) |
| | : | |
| v. | : | |
| | : | |
| MARGARET A. RITTER, | : | |
| | : | |
| Defendant. | : | |
| | : | |
| CHASE BANK USA, N.A., | : | |
| | : | |
| Plaintiff, | : | Adv. No.  07-00339 (ELF) |
| | : | |
| v. | : | |
| | : | |
| MARGARET A. RITTER, | : | |
| | : | |
| Defendant. | : | |

# O P I N I O N

## I.  INTRODUCTION

In 1985, Margaret A. Ritter ("the Debtor") opened a credit card account with Chase Bank

USA, N.A. ("Chase").  She opened a second credit card account with Chase in 1990.  She filed a

voluntary chapter 7 bankruptcy petition on July 9, 2007.  At that time, she owed Chase more than

$28,000, accounting for one-half of her total of unsecured debt.

In these adversary proceedings, Chase seeks a determination that approximately $9,700.00 of the Debtor's prepetition credit card debt is nondischargeable under 11 U.S.C. §§523(a)(2)(A) and (C).  Alternatively, Chase objects to the Debtor's discharge under 11 U.S.C. §727(a)(3).

In connection with its §523(a) claim, Chase alleges that, prior to filing her chapter 7 bankruptcy petition, the Debtor obtained cash advances and/or wrote convenience checks on the credit lines on her Chase accounts when she did not have the intent or ability to repay Chase.  See id. §523(a)(2)(A).  Chase additionally contends that some of the Debtor's credit usage extended into the statutory nondischargeability "presumption period."  See id. §523(a)(2)(C).  Chase requests:  (1) the entry of a money judgment in its favor; (2) relief from the automatic stay to collect the judgment; (3) an award of interest; and (4) attorney's fees and costs.  As for its §727(a)(3) objection to discharge, Chase asserts that the Debtor failed to retain adequate records regarding credit card accounts she maintained with certain other companies.

The Debtor denies Chase's material allegations and, pursuant to 11 U.S.C. §523(d), she has filed a counterclaim to Chase's §523(a) claim, seeking an award of attorney's fees and costs incurred in defending these adversary proceedings.

For the reasons set out below, I determine that:

(1)    the debt is dischargeable under §523(a)(2)(A) and (C);

(2)    the Debtor is not entitled to an award of attorney's fees and costs under §523(d); and

(3)    denial of discharge is not warranted under §727(a)(3).

Therefore, I will enter judgment against Chase on its claims and against the Debtor on her

counterclaim.

## II.  PROCEDURAL HISTORY

The Debtor filed a voluntary petition under chapter 7 of the Bankruptcy Code on July 9,

2007.  Chase filed its first adversary complaint on August 30, 2007 (Adv. No. 07-323).  In that

Complaint, Chase requested a determination of nondischargeability with respect to $4,400.00 of

a prepetition debt of $15,403.38 the Debtor incurred on the credit card account with the ending

digits 7666 ("Account No. 1").  The Debtor filed an Answer and Counterclaim for attorney's fees

and costs on October 1, 2007.[1]

Chase filed its second adversary complaint on September 21, 2007 (Adv. No. 07-339).  In

that Complaint, Chase requested a determination of nondischargeability with respect to

$5,346.39 of a prepetition debt of $12,839.69 the Debtor incurred in the credit card account with

the ending digits 8947 ("Account No. 2").  As with the first adversary complaint, the Debtor filed

an Answer and Counterclaim for attorney's fees and costs.[2]

Because of the commonality of the claims and related facts surrounding the transactions,

the two adversary proceedings were consolidated for trial.  See  Adv. No. 07-339, Docket Entry

No. 15.  Trial was held on October 20, 2008.  Two witnesses testified:  Ms. Michelle Donaldson,

---

[1]      Chase filed an Answer to the Debtor's Counterclaim on October 11, 2007.  See Docket
Entry No. 9.  Subsequently, with leave of court, Chase filed an Amended Complaint on July 18, 2008.
See Docket Entry No. 52.  The Debtor filed an Answer and Counterclaim to the Amended Complaint on
July 30, 2008, and Chase filed an Answer to the Debtor's Counterclaim on July 31, 2008.  See Docket
Entry Nos. 58, 59.

[2]      Chase filed an Answer to the Debtor's Counterclaim on October 29, 2007.  See Docket
Entry No. 8.

on behalf of Chase, and the Debtor.  Several documents were identified and admitted into

evidence.  Post-trial briefing concluded on October 29, 2008.

### III.  FINDINGS OF FACT

Based upon the testimony and documentary evidence introduced at trial, I make the

following findings of fact:

1.   The Debtor filed a voluntary chapter 7 bankruptcy petition on July 9, 2007.  (Bky. No. 07-

13863, Docket Entry No. 1).

2.   On Schedule I of the Debtor's petition, the Debtor reported a monthly income of $1,818.72.

On Schedule J, the Debtor listed $1,931.00 in average monthly expenditures.  On Schedule

F, the Debtor listed nine (9) unsecured debts totaling $51,708.00.  (Exh. P-1).

3.   The Debtor is a resident of Downingtown, Pennsylvania.  (N.T. 39).  She is a high school

graduate and attended college for approximately one and a half (1 ½) years.  (N.T. 40).

4.   The Debtor has been employed by the First National Bank of Chester County for forty-three

(43) years.  At the time of trial, she was employed as a transit sorter operator and was

earning approximately $40,000.00 annually.  In that position, she "process[ed]" the work

bank tellers took "in over the counter" every day.  (N.T. 40, 52-53).

5.   Pursuant to mail solicitations offering a consumer line of credit, the Debtor and Chase

entered into two (2) separate consumer credit agreements on December 3, 1985 and August

15, 1990.  (N.T. 20, 61).  Chase established two individual credit card accounts for the

Debtor, both of which were open-ended credit plans.  (N.T. 21).

6.   At the time she filed her bankruptcy petition, the Debtor had outstanding balances on the

-4-

two (2) Chase accounts.  Account No. 1 had a balance of $15,403.38 and Account No. 2 had a balance of $12,839.69. (Exh. P-12 at 0001, P-13 at 0001).

7.    On Schedule F, the Debtor listed AT&T Universal Card ("AT&T") in connection with a $6,500.00 miscellaneous consumer debt claim.  (Exh. P-1).  While she maintained a credit card account with AT&T, the Debtor received a credit card statement every month.  (N.T. 44).  After she ascertained that the charges were correct and that her payments were credited to the account, the Debtor would retain the statement for a couple of months and then shred it.  (N.T. 45).  At the time she filed for bankruptcy, the Debtor did not have any AT&T statements in her possession other than the most recent statement she received just prior to filing.  (See Joint Pretrial Statement, Statement of Undisputed Facts No. 34).  Chase was not able to obtain copies of the Debtor's AT&T statements.

8.    On Schedule F, the Debtor also listed a $5,500.00 claim associated with miscellaneous consumer debt owed to CitiBank with respect to an account ending in the digits 9802. (Exh. P-1).  While she maintained this credit card account with CitiBank, the Debtor received monthly credit card statements from CitiBank and followed the same retention policy described above with respect to AT&T.  (N.T. 45-46).  At the time she filed for bankruptcy, the Debtor did not have any CitiBank statements in her possession for her account ending in 9802 other than the most recent statement she received just prior to filing.  (See Joint Pretrial Statement, Statement of Undisputed Facts No. 34). Chase was not able to obtain copies of the Debtor's CitiBank statements for the 9802 account.

-5-

9.    On Schedule F, the Debtor also disclosed a $1,068.00 debt to Wells Fargo Financial

("Wells Fargo").  (Exh. P-1).  The Debtor attributed this debt to a "loan check."  (N.T. 47-

8).  The Debtor followed the same retention policy with respect to the monthly statements

she received from Wells Fargo that she did with CitiBank and AT&T.  (N.T. 48). Other

than the most recent statement she received prior to filing for bankruptcy, the Debtor no

longer had the Wells Fargo statements in her possession.  (See Joint Pretrial Statement,

Statement of Undisputed Facts No. 34).  Other than the Debtor's statement for June 4, 2007

(see Exh. P-16), Chase was not able to obtain copies of the Debtor's Wells Fargo

statements.

10.   Prior to filing for bankruptcy, the Debtor paid at least the monthly minimum payments on

her Chase accounts.  (N.T. 34).

11.   Prior to October 2005, the Debtor resided for many years with her mother, Margaret M.

Ritter ("Mrs. Ritter"), in a residence Mrs. Ritter owned.  (N.T. 53-54, 79).

12.   The Debtor's nephew, John Ritter, also resided in the household.  He came to live with the

Debtor and Mrs. Ritter in approximately 1985, when he was an infant.  (N.T. 58, 79).

13.   As of the date of trial, John Ritter was 22 years old (23 as of November 2008) and

unemployed.  He did not complete high school.  (N.T. 79).

14.   While the Debtor resided with Mrs. Ritter, Mrs. Ritter paid "a lot of the household

expenses herself."  (N.T. 58, 92).  She also paid all of John Ritter's expenses.  (N.T. 58).

15.   In January 2005, Mrs. Ritter passed away.  (N.T. 78).

16.    At the time of Mrs. Ritter's death, the Debtor had approximately $40,000.00 in total credit

card debt and was paying over $1,000.00 per month to service the minimum payments due

on her credit cards.  She was able to afford these payments because of her mother's

financial contribution to the household.  (N.T. 80-82).

17.    After her death, Mrs. Ritter's home was sold.  (N.T. 54)

18.    In 2005, the Debtor received an inheritance from Mrs. Ritter's estate totaling approximately

$35,000.00, which was disbursed to her in two payments.[3]

19.    The Debtor used approximately $6,000.00 from the inheritance to make an equity payment

on a mobile home she purchased, where she currently resides with her nephew.  (N.T. 49 -

50, 57).

20.    The Debtor also used the inheritance to make two (2) large payments on her Chase credit

cards as follows:

        a.    $8000.00 on July 18, 2006 on Account No. 1, leaving her with a balance
of $3,817.82 as of July 24, 2006 (Exh. P-13 at 00045); and

        b.    $5000.00 on June 21, 2006 on Account No. 2, leaving her with an account
balance of $5,098.27 as of June 28, 2006 (Exh. P-12 at 00047).[4]

----

[3]    The Debtor initially testified that she received approximately $47,813.15 from her
mother's estate in two payments of $22,000.00 in October 2005 and $25,813.15 in May 2006.  (N.T. 56).
However, a review of the disbursement schedule for the estate suggests that, from these disbursements,
$12,551.00 was actually paid on account of two of her mother's credit card debts.  (See N.T. 88-89, 97).

[4]    The documentary evidence also suggests that the Debtor made a $1,000.00 payment on
June 12, 2006 to CitiBank with respect to her credit card account ending in the digits 5285.  (See Exh.
14).

21.  In August 2006, the Debtor made a payment of $400.00 on Account No. 1 and reduced her balance to $3,512.86 as of August 24, 2006.  (Exh. P-13, at 00041).

22.  In July and August 2006, the Debtor made additional payments totaling $800.00 on Account No. 2 and reduced her balance to $4,533.80 as of August 28, 2006.  (Exh. P-12, at 00039, 00043).

23.  Thereafter, the Debtor's credit card debt mounted.  After Mrs. Ritter passed away, the Debtor became responsible for all of the household expenses, including John Ritter's support.  No longer being able to rely upon Mrs. Ritter's income to assist with household expenses, and with her inheritance income now depleted, the Debtor's monthly expenditures exceeded her monthly income.  (N.T. 93-95).  She could not pay her household expenses and monthly credit card bills without taking cash advances from Chase.  (N.T. 94-95, 70-71).

24.  The Debtor hoped her nephew would obtain employment and contribute to the household finances; she pressured him to do so.  However, he has been unemployed since he withdrew from school.  (N.T. 93-95).

25.  In the period between July 2006 and the filing of the bankruptcy case in July 2007, the Debtor had at least seven (7) other credit card accounts ("the Other Accounts") in addition to the two (2) Chase accounts.  The Other Accounts were with Dell Financial, CitiBank (2 accounts), Cardmember Services, WF Financial, Boscov's and Strawbridge's (which later became Macy's).  (Exh. P-22, at 2).

-8-

26.    Based on the available evidence relating to four (4) of the seven (7) Other Accounts, in the

period between July 2006 and the filing of the bankruptcy case in July 2007,[5] the Debtor

used several of the Other Accounts to purchase goods and services.  For example, she used

her CitiBank account ending in 5285 to pay for, <u>inter</u> <u>alia</u>, meals at restaurants, internet

services, cell phone expenses, automobile expenses, movies and purchases at grocery,

apparel, sporting good and video rental stores.  (<u>See</u> Exh. 14; <u>see</u> <u>also</u> (Exhs. 19, 20, 21

(relating to other credit card accounts)). The Debtor paid at least the minimum monthly

payment on these Other Accounts using funds available from her income and her Chase

credit lines.  (Exhs. P-14, P-19, P-20, P-21).[6]  For at least one of the Other Accounts, the

---

[5]    I have examined this time period most closely because July 2006 marks the approximate point in time when the Debtor received the final substantial cash infusion from the distribution from her mother's estate and July 2007 is when she filed for bankruptcy relief.  Chase's basic theory in this proceeding is that the Debtor's objective financial inability to repay her credit card debt is heavily probative of her actual intent not to repay the charges she incurred.  Between January 2005 (when the Debtor's mother died) and July 2006 (when she received the final distribution from her mother's estate), the Debtor likely expected to receive a substantial cash infusion from her mother's estate.  This expectation tends to negate Chase's theory.  After July 2006, however, the Debtor's continued use of the credit cards becomes more problematic because her expenses (including credit card debt service) exceeded her income and, other than the hope that her nephew would secure employment, there is no evidence that she had any expectation of increased income or receiving any other additional cash resources.

[6]    The table below summarizes the aggregate payments the Debtor made on the two (2) Chase accounts and the Other Accounts from August 2006 through June 2007.

| August 2006 | $1,750.00 |
| September 2006 | $1,280.00 |
| October 2006 | $1,900.00 |
| November 2006 | $1,550.00 |
| December 2006 | $1,675.00 |
| January 2007 | $1,400.00 |
| February 2007 | $1,670.00 |

account balance increased during that time period; the account balances on some of the

Other Accounts  decreased in the same time period.[7]

27.    With two exceptions, the Debtor used the Chase accounts exclusively for cash advances.[8]

_____

| | |
|---|---|
| March 2007 | $  980.00 |
| April 2007 | $1,960.00 |
| May 2007 | $1,780.00 |
| June 2007 | $  890.45 |

See Exh. P-22.

        It is likely that the Debtor also made monthly payments on the three (3) credit accounts
as to which records were unavailable, Of course, it is also possible that the Debtor used those accounts to
purchase goods and services or take cash advances.  Due to the lack of evidence, I cannot draw any
conclusions regarding the Debtor's use of those three (3) accounts.


    [7]    The table below summarizes the how the account balances changed in four (4) of the
seven (7) Other Accounts:

| Creditor | Balance in 2006 | Balance - July 2007 | Difference |
|---|---|---|---|
| CitiBank 5285 | $3,070.78  (as of 7/18/06) | $5,512.92 | $2,442.14 |
| Boscov's | $2,757.85  (as of 8/10/06) | $2,701.15 | ($  56.70) |
| Macy's | $1,202.47  (as of 7/25/06) | $1,865.57 | $  663.10 |
| Dell | $1,800.88  (as of 7/20/06) | $  911.00 | ($ 888.88) |

        The unavailable records from the three (3) Other Accounts may have been helpful in
evaluating the Debtor's conduct.  For example, if, in this time period, the Debtor did not use the three (3)
accounts to draw additional cash advances or make purchases of goods and services, but instead merely
paid back existing debt, then, combined with other evidence, one might infer that the Debtor used her
available credit with a subjective intent of repaying her debt.  On the other hand, if, in addition to using
Chase cards to make up her income shortfall, the Debtor was using the Other Accounts for cash advances
or purchases of goods and services, one might draw the opposite conclusion.  In the absence of evidence
on the issue, I will draw no conclusion either way.


    [8]    Those exceptions consist of a convenience check drawn on Account No. 2 and written to
the order of Meineke Car Care on February 10, 2007 and Blockbuster Video charges made on June 4 and
5 of 2007 and January 12, February 12 and  March 12 of 2006 on Account No. 2.

28.    The Chase account balances increased substantially between July 2006 and July 2007 as

follows:

| Account | Balance in 2006 | Balance as of July 2007 | Difference |
|---------|-----------------|-------------------------|------------|
| No. 1 | $3,817.82 (as of 7/24/06) | $15,403.38 | $11,585.56 |
| No. 2 | $4,718.58 (as of 7/28/06) | $12,839.69 | $ 8,121.11 |

29.    With respect to Account No. 2, There were four (4) monthly billing cycles between July

2006 and July 2007 in which the Debtor made payments on the account without drawing

down any cash from her credit line[9] and one (1) month in which she drew down only

$100.00.

30.    In early to mid 2007, the Debtor's car "died" and she had to "purchase transportation"[10] to

get to and from her place of employment.  (N.T. 66).  She took out a loan from her 401(k)

retirement plan to make the purchase.  This resulted in deductions from her biweekly salary

that reduced her monthly disposable income.  (N.T. 66-67).

31.    Within seventy (70) days of the filing of her bankruptcy petition, the Debtor wrote cash

advance checks totaling $4,400.00 on Account No. 1 as follows:

    a.  May 2, 2007        $2,500.00

    b.  May 17, 2007       $1,200.00

    c.  June 1, 2007       $700.00.

---

[9]       See Exhibit P-12 at 00007, 00019, 00023, 00027, 00039, and 00043.

[10]       In her testimony, I assume that the Debtor was referring to the 2006 Hyundai Elantra
listed in Schedule B of her bankruptcy schedules.

(Exh. P-13, at 0001, 0005; N.T. 42-43).

32.  Between January 1, 2007 and the filing of her bankruptcy petition, the Debtor wrote nine

(9) checks for cash or services totaling $5,346.39 on Account Number 2 as set forth below:

| | | |
|---|---|---|
| a. | January 27, 2007 | $600.00 |
| b. | February 10, 2007 | $696.39[11] |
| c. | February 10, 2007 | $300.00 |
| d. | February 20, 2007 | $500.00 |
| e. | February 24, 2007 | $150.00 |
| f. | March 22, 2007 | $700.00 |
| g. | March 27, 2007 | $100.00 |
| h. | May 16, 2007 | $1,500.00 |
| I. | May 31, 2007 | $800.00. |

(Exh. P-3 through P-11; Exh. P-12 at 0001).

33.  The last two (2) checks referenced in ¶32 above, totaling $2,300.00, were written within 70

days of the filing of the bankruptcy petition.

34.  The transactions referenced in Paragraphs 31-32 constitute extensions of consumer credit

under an open-ended credit plan.

35.  The Debtor first consulted with a bankruptcy attorney in late June 2007,  just prior to filing

her bankruptcy petition on July 9, 2007.  She did not use her Chase accounts after meeting

---

[11]     This check was written to the order of Meineke Car Care.  All of the others were written
to cash.

with counsel.  (N.T. 61).

36.   When she used her Chase credit accounts, the Debtor understood that she was obligated to
      pay back her debt to Chase.  She also was aware that Chase thought that she had the intent
      and ability to pay back the debts.  (N.T. 67-68).

37.   The Debtor did not use either the Chase accounts or the Other Accounts to purchase luxury
      items.

38.   In the approximate one (1) year  period leading up to her bankruptcy filing, the Debtor did
      not have the ability to meet her expenses, including her monthly credit card payment
      obligations, without taking cash advances.  (N.T. 70-71).

39.   When the Debtor used her Chase credit lines in 2007, she did so with the intent of repaying
      her debts to Chase.  (N.T. 67, 71).


## IV. CONTENTIONS OF THE PARTIES

Chase seeks to except from discharge $9,746.39 of debt the Debtor incurred on her two

(2) Chase credit accounts.  With respect to Account No. 1, Chase asserts that $4,400.00 in checks

the Debtor wrote within seventy (70) days of the bankruptcy filing is nondischargeable.  With

respect to Account No. 2, Chase asserts that $5,346.39 in checks written after January 1, 2007 is

nondischargeable.

Chase contends that the Debtor: (1) made an implied representation to Chase when she

initially obtained credit and each and every time she used her credit line that she had the intent

and ability to repay her debt; (2) used the Chase credit lines without an intent or ability to repay her obligation and (3) knew or should have known that her representation regarding her ability to repay the debt was false or was made with reckless disregard as to her ability to repay.  Chase further argues that it justifiably relied on the Debtor's misrepresentations to its detriment.  See Chase Memorandum of Law at 3.

The Debtor maintains that the evidence at trial established that, at all times prior to the filing of the bankruptcy, she made no misrepresentations to Chase.  The Debtor asserts that she paid her credit card bills every month and had every intention of repaying her debt to Chase, as evidenced by, inter alia, the two large lump-sum payments she made to Chase in June and July 2006.  The Debtor asserts further that, based on the facts and circumstances surrounding the transactions involved, Chase was not substantially justified in bringing these adversary proceedings.  Debtor's Memorandum of Law at 2-3.

## V.  NONDISCHARGEABILTY  - 11 U.S.C. §§523(a)(2)(A) and (C)

### A.  Elements of a Claim Under 11 U.S.C. §523(a)(2)(A)

In these adversary proceedings, 11 U.S.C. §523(a)(2)(A) is one of the relevant provisions underlying Chase's nondischargeability claim.  Section 523(a)(2)(A) provides in pertinent part:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt–
>
> > (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by–

-14-

> (A) false pretenses, a false representation, or actual fraud,
> other than a statement respecting the debtor's or an
> insider's financial condition . . . .

Section 523(a)(2)(A) is interpreted according to the general common law of torts.  Field

v. Mans, 516 U.S. 59, 70 n.9, 116 S. Ct. 444 n.9 (1995).  In order for a debt to be declared non-

dischargeable under §523(a)(2)(A), a plaintiff must prove that:

> 1.  the debtor made a false representation;
>
> 2.  at the time of the representation, the debtor knew it was false;
>
> 3.  the false representation was made with the intent and purpose of deceiving the
> creditor;
>
> 4.  the creditor justifiably relied upon the representation; and
>
> 5.  the creditor sustained damage as a proximate result of the misrepresentation.

E.g., In re Feld, 203 B.R. 360, 365 (Bankr. E.D. Pa. 1996); In re Blanchard, 201 B.R. 108, 115

(Bankr. E.D. Pa. 1996); accord In re Acosta, 406 F.3d 367, 372 (5th Cir. 2005).  The creditor

contesting dischargeability must prove each element by a preponderance of the evidence.  Grogan

v. Garner, 498 U.S. 279, 283-91 (1991).


### B.  The Statutory Presumption Under 11 U.S.C. §523(a)(2)(C)

The total amount of debt at issue in these dischargeability proceedings is $9,746.39.  Of

that amount, Chase asserts that $6,700.00 is subject to a statutory presumption that may ease its

burden of proof considerably.  Under 11 U.S.C. §523(a)(2)(C)(i)(II), there is a presumption that

certain cash advances in excess of $825.00, obtained by the debtor within seventy (70) days of

-15-

the bankruptcy filing, are nondischargeable.[12]

It is the creditor's initial burden to establish that the §523(a)(2)(C) presumption applies.

E.g., In re Manning, 280 B.R. 171, 179 (Bankr. S.D. Ohio 2002); In re Koch, 83 B.R. 898, 902

(Bankr. E.D. Pa. 1988).  The effect of the presumption, when applicable, is not well settled.  Two

(2) separate issues exist:  (1) whether the presumption shifts the burden of persuasion from the

creditor to the debtor; and (2) whether the presumption applies to the ultimate question of

dischargeability or whether it is limited to only one element under §523(a)(2)(A), namely, the

debtor's deceptive intent.[13]   Courts are divided on these issues.

---

[12]      Section 523(a)(2)(C)(i)(II) provides that, for purposes of §523(a)(2)(A):

> (II) cash advances aggregating more than $ 825 that are extensions of consumer
> credit under an open end credit plan obtained by an individual debtor on or
> within 70 days before the order for relief under this title, are presumed to be
> nondischargeable.

Further, section 523(a)(2)(C)(ii) provides that for purposes of §523(a)(2)(C):

> (I) the terms "consumer", "credit", and "open end credit plan" have the same
> meaning as in section 103 of the Truth in Lending Act; and

> (II) the term "luxury goods or services" does not include goods or services
> reasonably necessary for the support or maintenance of the debtor or a dependent
> of the debtor.

[13]      Courts holding that the presumption is limited to the debtor's deceptive intent have
reasoned, for example, that:

> 'Congress' motive for adding § 523(a)(2)(C) to the Bankruptcy Code in 1984 was
> to rectify a perceived practice by debtors of 'loading up,' or going on credit
> buying sprees in contemplation of bankruptcy.' The subsections presume that the
> debtor purchased the items or obtained the cash advance without intending to
> repay the creditor.  To rebut the presumption of fraudulent intent, the debtor
> therefore must directly attack the presumed fact and raise substantial doubt in the

Some courts hold that the presumption operates only to shift the burden of production to the debtor, and that the ultimate burden of proof of nondischargeability remains on the creditor. See, e.g., In re LaBovick, 355 B.R. 508, 515 (Bankr. W.D. Pa. 2006); In re Fulginitti, 201 B.R. 730, 734 (Bankr. E.D. Pa. 1996); Koch, 83 B.R. at 902; see also Fed. R. Evid. 301.  Further, some courts suggest that the presumption "only shifts to the debtor the initial burden of production regarding the issue of intent; it does not, by itself, shift the ultimate burden of proof or the initial burden of production on any other issues."  E.g., Fulginiti, 201 B.R. at 734; accord Koch, 83 B.R. at 902.

Other courts, however, have concluded that, once the creditor meets its burden of establishing the applicability of the presumption, "the presumption transforms the burden into one of proving the debt is dischargeable and places that burden squarely on the shoulders of the debtor."  In re Cron, 241 B.R. 1, 8 (Bankr. S.D. Iowa 1999).  For such courts, the presumption reduces the litigation to a single issue – the debtor's intent  – and it is the debtor's burden to prove an absence of fraudulent intent to defeat the creditor's nondischargeability claim.  See In re Ellingsworth, 212 B.R. 326, 340 (W.D. Mo. 1997) ("it is the debtor's intent alone, and not the

---

mind of the trier of fact as to the existence of the presumed intent. The presumption can be rebutted by evidence that the 'portion of such claim was not incurred in contemplation of ... discharge in bankruptcy.'

In re Fuller, 2007 WL 3245404, at *2 (Bankr. D. Kan. Nov. 2. 2007) (internal citations omitted).

creditor's conduct, which determines dischargeability").[14]

Whatever the scope of the presumption and the parties' subsequent burdens may be, if the presumption arises, the debtor may rebut it.  Generally, evidence establishing that the debtor did not incur the debt in contemplation of bankruptcy will suffice to rebut the presumption.  E.g., LaBovick, 355 B.R. at 515; S. Rep. No. 98-65, 98th Cong. 1st Sess. 58 (1983).  Rebuttal evidence also may be sufficient if it establishes that there was a sudden change in the debtor's circumstances, In re Green, 296 B.R. 173, 180 (Bankr. C.D. Ill. 2003), or that the debtor did not contemplate filing for bankruptcy until after the debtor took the cash advances, id., or that the debtor had the subjective intent of repaying the debt at the time the cash advances were obtained, In re Goodman, 2007 Bankr. LEXIS 613, at *4-5, 15-17 (Bankr. N.D. Ga. Jan. 25, 2007) (debtor may rebut presumption by demonstrating that he did not make charges or advances without actual, subjective intent to pay them); Ellingsworth, 212 B.R. at 341 ("debtor must offer substantial and believable evidence contrary to presumed intent in order to demonstrate non-fraudulent intent"); In re Orecchio, 109 B.R. 285, 290 (Bankr. S.D. Ohio 1989) (rebuttal evidence must raise substantial doubt in mind of trier of fact as to existence of presumed intent).

## C.  Other Issues Arising Under 11 U.S.C. §523(a)(2)(A)

Before returning to the facts of this case, there are two (2) issues arising under

---

[14]        For the reasons explained in Part V.D. & n.19, infra, I need not choose sides in the judicial debate regarding the effect of the §523(a)(2)(C) presumption.

§523(a)(2)(A) that require discussion.

### 1.  the Debtor's implied representation under §523(a)(2)(a)

In adversary proceedings under §523(a)(2)(A) that are based on the debtor's use of a

credit card account, an initial question that arises is whether the debtor made <u>any</u> representation

to the creditor.  As Judge Sigmund observed in <u>Feld</u>,

> The application of § 523(a)(2)(A) to credit card debt is particularly difficult
> because of the nature of a typical credit card transaction which involves no
> face-to-face contact with a lender. The decision to extend credit to a debtor is
> made at the beginning of the debtor-creditor relationship when a prospective
> debtor is approved for a credit card. Later, when the debtor uses the card, credit is
> extended after verification of the validity of the card and the holder's pre-existing
> approved status by a third party merchant or bank who then looks to the credit
> card company for payment. Against this transactional reality, courts have
> attempted to measure the debtor's representations and the creditor's reliance
> thereon, and have fashioned various approaches to support non-dischargeability
> judgments in credit card cases.  Clearly to give literal effect to the statute would
> be to except credit card transactions from the reach of § 523(a)(2)(A) since a
> debtor makes no actual representation to the creditor when using a card and a
> credit card issuer, not a direct party to the transaction whereby the credit is
> accessed, does not contemporaneously rely on any representation, even one
> implied.

<u>Feld</u>, 203 B.R. at 365-66 (footnotes omitted).

There are at least two (2) lines of authority regarding the scope of the representation a

consumer impliedly makes by using a credit card.  Some courts hold that the use of a credit card

is an implied representation[15] of an intention to repay the charges incurred.  <u>See</u> <u>In re Anastas</u>, 94

---

[15]    I note that several courts have held that the cardholder makes an actual representation of
an intention to repay the money borrowed.  <u>See</u> <u>In re Briese</u>, 196 B.R. 440, 450 (Bankr. W.D. Wis. 1996);

F.3d 1280, 1285 (9th Cir. 1996); LaBovick, 355 B.R. at 514; In re Johnson, 313 B.R. 119, 128

(Bankr. E.D.N.Y. 2004).  Other courts take a broader view, holding that, by using a credit card, a

consumer represents that he or she has both the intent and ability to repay the credit card issuer.

See, e.g., In re Wong, 207 B.R. 822, 827 (Bankr. E.D. Pa. 1997); In re Flynn, 184 B.R. 8, 9

(Bankr. E.D.N.Y. 1995); In re Carrier, 181 B.R. 742, 747 (Bankr. S.D.N.Y. 1995) In re

McDonald, 177 B.R. 212, 216 (Bankr. E.D. Pa. 1994); In re Sharp, 144 B.R. 372, 374 (Bankr.

S.D. Ohio 1992).

    This difference in approach is not insignificant and could alter the outcome of a

dischargeability case under §523(a)(2)(A), including, perhaps, the case sub judice.  After

considering the competing lines of authority, I adopt the narrower view – that the use of the

credit card constitutes an implied representation of the debtor's subjective intent to repay the debt

and not a representation of the debtor's ability to repay.

    I agree with Judge Sigmund's insightful analysis in Feld.  To hold that use of the card is a

representation of the debtor's ability to pay

> would make a credit card debtor a guarantor of his or her financial condition, and
> would be contrary to the reason consumers use credit cards, i.e., because they lack
> the ability to pay in full.  Many, if not most, consumer bankruptcy debtors incur
> additional liabilities after the point at which repayment becomes hopeless.  To use
> a debtor's poor financial condition against her or him is antithetical to the fresh
> start policy and confers an advantage on credit card issuers unintended by

---

Feld, 203 B.R. at 366; see also In re Rembert, 141 F.3d 277, 280 (6th Cir. 1998) (use of a credit card is
either an actual or implied representation).  For purposes of applying §523(a)(2)(A), it appears
immaterial whether the representation is characterized as "actual" or "implied."  Either way, a legal
fiction is being employed.  In my view, characterizing the representation as "implied" is more accurate.

Congress.

203 B.R. at 367-68 (citation and footnote omitted); <u>see also</u> <u>In re Kukuk</u>, 225 B.R. 778, 785 (.

10th Cir. B.A.P. 1998) (creditors market credit cards to encourage consumers to use them when

they lack a present ability to pay at time card is used).

Further, focusing on the debtor's insolvency and future prospects at the time he or she

uses the credit card account conflates the issue of false representation with the issue of intent.

Certainly, a debtor's financial condition at the time he or she uses a credit card is relevant in

evaluating whether the debtor subjectively intended to repay the credit card charges incurred.

But treating the debtor's use of a credit card as a representation of the debtor's ability to pay runs

the risk of transforming the dischargeability inquiry, which involves evaluating the debtor's

subjective state of mind with respect to his or her good faith intention to repay the debt, into an

objective test concerning the reasonableness of the debtor's conduct based on his or her then

existing financial condition.  I find this inappropriate under a statutory provision that is based on

"false pretenses, false representation, or actual fraud," terms that all connote a degree of scienter

higher than breach of the objective standard of conduct of the "reasonable person."[16]

---

[16]    <u>See</u> <u>Rembert</u>, 141 F.3d at 281 ("the hopeless state of a debtor's financial condition
should never become a substitute for an actual finding of bad faith"); <u>Anastas</u>, 94 F.3d at 1285-86
(emphasizing that focus under §523(a)(2)(A) is not whether debtor is hopelessly insolvent but whether
debtor maliciously and in bad faith incurred credit card debt with intention of avoiding debt through
bankruptcy); <u>see also</u> <u>In re Schwartz & Meyers</u>, 130 B.R. 416, 422 (Bankr. S.D.N.Y. 1991) ("To be
actionable, the debtor's conduct must involve moral turpitude or intentional wrong; mere negligence,
poor business judgment or fraud implied in law (which may exist without imputation of bad faith or
immorality( is insufficient").

-21-

Finally, treating the use of a credit card as a representation of an ability to repay the debt

is inconsistent with the text of §523(a)(2)(A), which expressly excludes from the scope of its

discharge exception debts arising from a misrepresentation "regarding the debtor's . . . financial

condition." See Mercer, 246 F.3d at 405; In re Cole, 226 B.R. 647, 656 (B.A.P. 9th Cir. 1998);

Kukuk, 225 B.R. at 785; Anastas, 94 F.3d at 1285; In re Johnson, 313 B.R. at 128; In re

Melancon, 223 B.R. 300, 322 (Bankr. M.D. La. 1998). Cases involving such misrepresentations

of a debtor's financial condition are addressed separately in 11 U.S.C. §523(a)(2)(B) and are

limited to representations made in writing. Oral misrepresentations are not included, much less

implied representations.


## 2. proving intent by "the totality of the circumstances"

In credit card cases under §523(a)(2)(A), the second and third elements of a

nondischargeability claim under §523(a)(2)(A) (i.e., whether the representation was false and

whether the debtor made the representation with the intent and purpose of deceiving the creditor)

tend to merge into a single inquiry: did the debtor lack an intent to repay when he or she incurred

the credit card charges? Courts have recognized that proving a debtor's state of mind at the time

a credit card charge is incurred can be a difficult task. See, e.g., Mercer, 246 F.3d at 409 ("A

debtor rarely will admit card-debt is incurred with the intention of not paying it"). As with other

types of legal claims that require proof of a party's intent, courts have found the use of

circumstantial evidence to be sufficient. Consequently, proof of a debtor's intent under

§523(a)(2)(A) may be established by evaluating the totality of the circumstances.  See Cohn, 54

F.3d at 1118-19.

Courts consider various factors relevant in determining a debtor's intent:

1.  The length of time between when the charges were made and the bankruptcy filing;

2.  Whether an attorney was consulted concerning the filing of bankruptcy before the charges were made;

3.  The number of charges made;

4.  The amount of the charges;

5.  The debtor's financial condition at the time the charges were made;

6.  Whether the charges were above the account's credit limit;

7.  Whether the debtor made multiple charges on the same day;

8.  Whether the debtor was employed;

9.  The debtor's prospects for employment;

10.  The debtor's financial sophistication;

11.  Whether there was a sudden change in the debtor's buying habits; and

12.  Whether the purchases were made for luxuries.

E.g., In re Dougherty, 84 B.R. 653, 657 (9th Cir. BAP 1988); see also, In re Eashai, 87 F.3d 1082,

1088-89 (9th Cir. 1996); In re Feld, 203 B.R. at 367.  However, this list of factors serves only as a

guide in examining the debtor's subjective intent; no single factor necessarily establishes an

intent to deceive.  In re Herrig, 217 B.R. 891, 897 (Bankr. N.D. Okla. 1998); In re Sutliff, 112

B.R. 680, 683 (Bankr. M.D. Pa. 1990).  For example, the mere fact that the debtor has the

inability to pay may be considered in determining the debtor's intent, but standing alone, it might

not support a finding of fraudulent intent.  See In re Shadinger, 357 B.R. 158, 166 (Bankr. N.D.

Ala. 2006);  In re Feld, 203 B.R. at 367; see also In re Rossiter, 2002 WL 31987288, at *6

(Bankr. E.D. Pa. Dec. 27, 2002); In re Janecek, 183 B.R. 571, 575 (Bankr. D. Neb. 1995).

### D.  Analysis

With the principles discussed in Part V.A.-C. in mind, I consider the evidence presented

at trial.

### 1.  summary

In these proceedings, I find that Chase met its burden of establishing the existence of the

§523(a)(2)(C) presumption with respect to $6,700.00 in cash advances.  Specifically, I refer to

three (3) cash advances totaling $4,400.00 on Account No. 1 and two (2) cash advances totaling

$2,300.00 on Account No. 2.  The record demonstrates conclusively that the Debtor obtained

$6,700.00 in cash from her credit card accounts within seventy (70) days of filing her bankruptcy

case.  See Finding of Fact Nos. 31-33.[17]  Therefore, there is a rebuttable presumption under

§523(a)(2)(C) that $6,700.00 of her debt to Chase is nondischargeable ("the Presumption Debt").

The dischargeability of the remaining $3,046.39 at issue in this proceeding must be determined

---

[17]      The use of a "convenience check" to draw cash from a credit card account is a "cash
advance" within the meaning of 11 U.S.C. §523(a)(2)(C).  See In re George, 381 B.R. 911, 914 (Bankr.
M.D. Fla. 2007);  In re Reid, 237 B.R. 577 (Bankr. W.D.N.Y. 1999); Feld, 203 B.R. at 364.

under §523(a)(2)(A) ("the Non-Presumption Debt").

Ultimately, however, I also conclude that all of the debt at issue is dischargeable.  The

Non-Presumption Debt is dischargeable because Chase has not proven that the Debtor incurred

that debt without intending to repay it.[18]  While it is a closer call, the same evidence that

persuades me that the Debtor lacked the requisite intent under §523(a)(2)(A) also defeats Chase's

nondischargeability claim with respect to the Presumption Debt (i.e., the evidence rebuts the

presumption of nondischargeability under 523(a)(2)(C) by the requisite evidentiary standard).[19]


## 2.  the Non-Presumption Debt

The central fact issue in this case, the Debtor's subjective state of mind, is ultimately

unknowable with certainty.  At some point in the deliberative process in a case (like this one) that

turns on a party's scienter, the factfinder must draw upon his or her experience and intuition to

make a judgment regarding the likely motivations underlying the party's conduct.

In this case, with respect to the Non-Presumption Debt, based on the evidence presented I

conclude that the Debtor's decision to draw down on her Chase credit card accounts, when she

---

[18]    Depending upon how one defines the elements of a §523(a)(2)(A) claim, Chase has either failed to prove that the first element (i.e., that there was a misrepresentation) and/or the second element (i.e., that the Debtor made a false representation with the intent of deceiving Chase).

[19]    With respect to the 523(a)(2)(C) claim, I find that the Debtor proved by a preponderance of the evidence that she did not incur the Presumption Debt with an intention to discharge the debt in bankruptcy.  Thus, even if I were to apply the §523(a)(2)(C) presumption in its most expansive form, with the burden of persuasion on the Debtor, I find that the Debtor has satisfied the heightened burden and rebutted the presumption.  Hence, my earlier statement that, to decide this case, I need not determine the precise contours of the §523(a)(2)(C) presumption.  See n.14, supra.

objectively lacked the ability to repay the debt, was an uninformed, imprudent decision, but not one made in bad faith or with an eye toward discharging the debt in bankruptcy.  I reach this conclusion for several reasons.

Based on the substance of her testimony and her demeanor, I found the Debtor to be a credible witness.  While her statement that she intended to repay the Chase debt is obviously self-serving, my favorable impression as to her honesty influences my decision to credit her testimony on the issue of her intent.

Further, generally speaking, the record paints a picture of an individual with a history of attempting to meet her financial obligations.  The Debtor has had a stable work history, having been employed by the same employer for forty-three (43) years.  She maintained her accounts with Chase for approximately seventeen (17) and twenty-two (22) years respectively, before she sought bankruptcy relief.  In her testimony on behalf of Chase, Ms. Donaldson described the Debtor as a "good customer."  See N.T. 34.  I infer that the Debtor met her obligations to Chase over an extended period of years.  The Debtor does not fit the stereotype of the bad faith debtor who obtains a credit card, exhausts the credit limit shortly thereafter and then promptly files a bankruptcy.  Her long relationship with Chase suggests quite the opposite.

Next, in several respects, the Debtor's pattern of usage of  her Chase accounts supports the finding that financial mismanagement, rather than a conscious decision to misuse her credit privileges, best explains the Debtor's conduct.

In the period from July 2006 to July 2007, the Debtor generally used her other credit card

accounts to purchase various goods and services while relying on her Chase accounts to cover the

shortfall between monthly her income and expenditures.  The balances on the two (2) Chase

accounts as of July 2006 totaled slightly more than $8,500.00.  <u>See</u> Finding of Fact No. 28.  The

aggregate balance in late April 2007, nine (9) months later, was approximately $21,300.00.  <u>See</u>

Exhibits P-12, at 00007 and P-13, at 00009.  The increased indebtedness over this relatively short

time period is substantial and, at first blush, may suggest bad faith usage of the credit line.

However, the Debtor's combined minimum monthly payment to Chase for the two (2) increased

only $86.00 per month..[20]

Viewed from this perspective, I doubt that an increase of $86.00 in her monthly payment

obligation to Chase over a nine (9) month period set off alarm bells in the Debtor's mind

sufficient to transform what might be best characterized as either an uninformed or desperate

attempt to keep up with her bills into an intentional use of credit without an intent to repay.  I

find it more likely than not that, when making her financial decisions, the Debtor focused

primarily on the amount of her monthly payment obligation, not her total indebtedness or the

---

[20]      The data below is derived from Exhibits P-12 (00045 and 00013) and P-13 (00043 and
00011):

**Minimum Payments**

|  | August  2006 Statement | April 2007 Statement |
|---|---|---|
| Account No. 1 | $252.00 | $249.00 |
| Account No. 2 | $167.00 | $256.00 |
| **Total** | **$419.00** | **$505.00** |

amount of finance charges that she was incurring.

The inference I draw from the Debtor's usage of her Chase accounts regarding her state of mind finds some further support in the history of Account No. 2. There were four (4) monthly billing cycles between July 2006 and July 2007 in which the Debtor made payments on the account without drawing down any cash from her credit line[21] and one (1) month in which she drew down only $100.00. While obviously not conclusive, this history strikes me as more consistent with a consumer's use of a credit line on an intermittent, "as needed" basis, rather than in bad faith.

Next, my review of the expenditures the Debtor made in the July 2006 to July 2007 period on her Other Accounts (which were funded in part by the cash advances the Debtor drew from her Chase accounts) does not suggest that the Debtor used her credit for any obvious luxury items.[22]

Nor has Chase developed the record to demonstrate that the Debtor's use of her Chase accounts and Other Accounts between July 2006 and April 2007 differed from her earlier use of the various credit lines. If a change in the Debtor's pattern of using her Chase cards had been

---

[21]     See Exh. P-12 at 00007, 00019, 00023, 00027, 00039, and 00043.

[22]     The Debtor went to restaurants with some degree of frequency, perhaps more than was prudent in light of the reduction in household income after her mother's death. However, on the whole, the cost of the meals were all relatively modest and she did not go to restaurants that would be considered "high end" or "luxury" establishments. She also spent a fair amount on household items and clothing. However, none of these expenditures were exceptional in amount. Also, during this time, she also provided the sole support to her nephew.

-28-

established, one might have inferred similarly that the Debtor's repayment intentions had also

changed. But no such a change was established.

I also find it significant that when the Debtor received a large cash infusion from her

mother's estate, she used a substantial portion of it to pay down her outstanding credit card

liabilities to Chase in June and July 2006. This act of fiscal responsibility is probative of an

intent to repay.[23]

I recognize that it is possible to draw the cynical inference that the Debtor's payment of

approximately $13,000.00 to Chase in June and July 2006 was an attempt to lull Chase and to

provide the Debtor with a greater opportunity to maximize her use of the available credit before

seeking bankruptcy relief. However, based on my assessment of the Debtor, including her

modest level of financial sophistication, I find that explanation unlikely. It is more likely that the

money from her mother's estate gave the Debtor the false impression that her pattern of credit

card usage was sustainable in the long run. Although her credit card account balances increased

over time in the initial period after her mother's death, she managed to pay her Chase accounts

down to a lower level after receiving the distribution from her mother's estate. As the credit card

balances again began to mount after August 2006, the Debtor likely believed, if only at a

subconscious level, that she would again find a way to pay down her credit card debt –

---

[23]        I am aware that the first charges that Chase contends the Debtor made fraudulent
occurred in January 2007. Arguably, the Debtor's large payments to Chase in mid-2006 are remote and
not probative of the Debtor's later intent. However, Chase has not explained why the Debtor's intent in
January 2007 suddenly turned "fraudulent" in January 2007 (or what evidence supports such a finding).
Therefore, I find it more helpful to review a larger time frame in evaluating the Debtor's scienter. See
n.5, supra.

somehow.  In effect, the cash infusion from her mother's estate allowed the Debtor to remain in a state of denial regarding her negative monthly cash flow and the need to change her spending habits.  I consider all of this to be a case of bad judgment, not fraud or bad faith.

From the available record, I infer that the pattern of credit card use that caused the Debtor's finances to spiral out of control probably began when her mother died in January 2005.  My sense of the Debtor is that the conduct that led to her bankruptcy filing was not based on a conscious choice to go on a final spending spree, but rather was a continuation of a pattern of financial mismanagement that eroded the Debtor's financial health over a period of at least two and one-half (2 ½) years, from early 2005 through mid-2007.  As such, it does not appear to be motivated by an intention to use a credit card without intending to pay for the charges.

Accordingly, with respect to the Non-Presumption Debt, I find that Chase has not established that the Debtor made a misrepresentation regarding her intent to repay and therefore, the Non-Presumption debt is dischargeable.[24]

### 3.  the Presumption Debt

As stated earlier, evaluation of the Debtor's conduct during the seventy (70) days prior to her bankruptcy filing presents a closer question as to her intent.  Nevertheless, the same considerations discussed in connection with the Non-Presumption Debt lead me to conclude that

---

[24]     Based on this finding, I need not determine whether Chase proved the other elements under §523(a)(2)(A).

she did intend to repay the debt she incurred during the presumption period[25] and therefore, that the Presumption Debt is also dischargeable.

There are two (2) features that stand out when comparing the Debtor's conduct in the final seventy (70) days leading up to her bankruptcy filing with her prior conduct.  First, the Debtor drew down more heavily on her Chase credit cards in May 2007 than in any prior month.[26] Second, the Debtor was faced with a sudden increase in her expenses because she had to purchase an automobile in either late April or early May 2007.[27]

The purchase of the automobile likely stretched the Debtor's already overextended finances past the breaking point.  The Debtor took out a loan from her 401(k) account for most of the purchase price of the vehicle, but she needed an additional $2,800.00 (approximately) to consummate the transaction.  Between the additional funds needed to purchase the car, the increased deduction from her already modest take-home pay to repay the 401(k) loan, it is not surprising that in the following four (4) to six (6) week period, the Debtor drew down more heavily on her available Chase credit lines to maintain minimum payments on her outstanding liabilities and, just a few weeks later, sought bankruptcy relief.

---

[25]     I reiterate that if the burden of proof falls on the Debtor on this issue, I find that she has met that burden.

[26]     Combined, in May 2007, the Debtor drew down $5,200.00 in cash advances from her accounts with Chase.  (See Exh. 13 at 00005; Exh. 12. at 00003).

[27]     The Debtor testified that she purchased the automobile because her car "died".  See Finding of Fact No. 28.   Presumably, she needed the car to drive back and forth from work.

-31-

However, the Debtor was in severe financial distress even prior to the seventy (70) day period. The increased financial burden created by the loss of the Debtor's old car and the need to purchase another vehicle probably just accelerated the inevitable bankruptcy filing. If I were to assume that the Debtor had no 401(k) loan prior to May 2007, that her salary and other payroll deductions and expenses were the same as that set forth a few months later in Schedules I and J of her bankruptcy schedules,[28] that would put Debtor's net monthly income in May 2007 slightly below $2,300.00/month[29] and her mortgage, school taxes, utilities, auto insurance and food expenses alone at $1,624.00, leaving less than $676.00 to address her credit card debt. At or around this time, the Debtor's combined minimum payments on the two (2) Chase accounts were $556.00 and her combined minimum monthly payments on the Other Accounts exceeded an additional $371.38.[30] This totals $927.38 and does not include the minimum payments on the

---

[28]    The assumption is probably not accurate. The Debtor's schedules suggest that she had an existing 401(k) loan before she took out the loan to purchase the car and that the loan used to purchase the car simply increased the amount of an existing payroll deduction. However, for purposes of the discussion in the text, the distinction is immaterial.

[29]    In arriving at this number, I have "added back" the 401(k) payroll deduction of $461.63 to the Debtor's disclosed combined average monthly income set forth in Schedule I of $1,818.72.

[30]    This amount is derived from the records from the available Other Accounts.

|  | Statement Due Date | Amount of Minimum Monthly Payment |
|---|---|---|
| Boscov's | 5/2/07 | $104.00 |
| Macy's | 5/20/07 | $ 49.00 |
| Dell | 5/15/07 | $ 34.00 |
| CitiBank | 5/10/07 | $146.38 |
| Wells Fargo | 6/4/07 | $ 38.00 ("regular payment amount" from June statement) |
|  | Total | $371.38 |

several credit accounts for which no records were available at trial.  Thus, by May 2007, absent

some material change in the Debtor's financial situation, it appears that, objectively, the Debtor's

economic position was unsustainable.  The question then is: Was the Debtor's continued use of

the Chase credit lines in May 2007, after she incurred the 401(k) loan that further reduced her

available monthly income, the product of a conscious choice to make one final use of the

remaining credit available on the Chase accounts without an intent to repay?

If based only on the objective hopelessness of the Debtor's situation in May 2007, the

record supports a finding that the Debtor incurred the Presumption Debt without an intent to

repay.  However, I am not convinced that, in the aftermath of the automobile's purchase, the

Debtor immediately understood the gravity of her situation.  Certainly, the financial

consequences of the purchase of the automobile could have served as an immediate "wake-up

call" to the Debtor.  And, had the Debtor's continuing use of the Chase credit lines continued for

any greater period of time, I might have been less inclined to attribute her actions to an ongoing

state of "financial denial," rather than bad faith.  However, based on my observation of her in

court and the totality of the circumstances, I believe that the Debtor needed some "lag time"

before she subjectively understood that she could no longer conduct her financial affairs by

relying on her credit lines.  The purchase of the automobile and the use of the convenience

checks giving rise to the Presumption Debt in May 2007 all took place within a relatively short

period of time  – just a few weeks.  In writing the Chase checks, I find it more likely that the

_____

See Exhs. 14, 16, 17, 19, 20.

Debtor's actions were simply part of her continuous pattern of uninformed, financial

mismanagement rather than a deliberate use of the Chase accounts without an intent to repay.

Therefore, the Presumption Debt, too, is dischargeable.


### VI.  DISCUSSION - DEBTOR'S COUNTERCLAIM  - 11 U.S.C. §523(d)

The Debtor seeks an award of attorney's fees and costs on her counterclaim under 11

U.S.C. §523(d).  Section 523(d) provides that if a debtor prevails in a dischargeability proceeding

under §523(a)(2) relating to a consumer debt:

> the court shall grant judgment in favor of the debtor for the costs of, and a
> reasonable attorney's fee for, the proceeding if the court finds that the position of
> the creditor was not substantially justified, except that the court shall not award
> such costs and fees if special circumstances would make the award unjust.

To prevail on this claim, the Debtor must establish five elements:

1.  the creditor must bring a dischargeability complaint under section 523(a)(2);

2.  the complaint must concern a consumer debt;

3.  the debt must be found to be dischargeable;

4. the court must find that the creditor's complaint was not substantially justified; and

5. there must be no special circumstances which would make the award of attorney's fees unjust.

In re Leonard, 158 B.R. 839, 846 (Bankr. D. Colo. 1993).

It is undisputed that the Debtor has satisfied the first three elements.  The next question is

whether Chase's position was substantially justified.

-34-

Courts apply a three (3) part test in evaluating whether a creditor's position is "substantially justified" within the meaning of §523(d).  The three criteria necessary to establish substantial justification at the time a complaint was filed are:  (1) a reasonable basis in law for the theory it propounds; (2) a reasonable basis in truth for the facts alleged; and (3) a reasonable connection between the facts alleged and the legal theory advanced.  In re Walker, 299 B.R. 141, 145 (S.D.W. Va. 2003); accord In re Williams, 224 B.R. 523, 531 (2d Cir. B.A.P. 1998); Fulginitti, 201 B.R. at 735-36.

I find that Chase's position in this proceeding was substantially justified.  A significant portion of the debt subject to this dischargeability dispute was presumed nondischargeable under §523(a)(2)(C).  The existence of the §523(a)(2)(C) presumption, at a minimum, put the burden of production on the Debtor to produce evidence at trial to overcome the presumption.  That sufficed to make Chase's position substantially justified.  As for the Non-Presumption Debt, Chase generated evidence that was sufficient to create a triable issue of fact whether the Debtor lacked the intent to repay the debt at issue.[31]  Again, this is sufficient to render Chase's position substantially justified.  The mere fact that a court draws inferences from the trial evidence that permits a debtor to prevail does not, by itself, mean that the creditor's position was unjustified.

For these reasons, I will enter judgment in favor of Chase on the Debtor's counterclaim

---

[31]      Further, throughout these proceedings, Chase advocated a version of the "implied theory of representation," that posits that, with each use of her credit card, the Debtor represented she had the intent and ability to repay the money borrowed.  Had I accepted that legal proposition, Chase's case would have been even stronger and Chase's position is not without support.  See, e.g., Wong, 207 B.R. at 827; Flynn, 184 B.R. at 9; Carrier, 181 B.R. at 747; McDonald, 177 B.R. at 216; Sharp, 144 B.R. at 374.

under §523(d).

## VII.  OBJECTION TO DISCHARGE – 11 U.S.C. §727(a)(3)

Chase has also alleged that the Debtor should not be granted a discharge pursuant to

§727(a)(3) because the Debtor failed to retain records regarding one (1) of her two (2) credit card

accounts with CitiBank and her credit card accounts with Wells Fargo and AT&T Universal.

Section 727(a)(3) provides:

> (a) The court shall grant the debtor a discharge, unless–
>
> *  *  *
>
>> (3) the debtor has concealed, destroyed, mutilated, falsified, or failed to
>> keep or preserve any recorded information, including books, documents,
>> records, and papers, from which the debtor's financial condition or
>> business transactions might be ascertained, unless such act or failure to act
>> was justified under all of the circumstances of the case.

"The purpose of section 727(a)(3) is to give creditors and the bankruptcy court complete

and accurate information concerning the status of the debtor's affairs and to test the completeness

of the disclosure requisite to a discharge."  Meridian Bank v. Alten, 958 F.2d 1226, 1230 (3d Cir.

1992).  "The test is whether there [is] available written evidence made and preserved from which

the present financial condition of the bankrupt, and his business transactions for a reasonable

period in the past may be ascertained."  Id. (internal quotations and citations omitted).

To state a prima facie case under section 727(a)(3), a party objecting to the discharge

must show (1) that the debtor failed to maintain and preserve adequate records and (2) this failure

to maintain makes it impossible to ascertain the debtor's financial condition and material business

-36-

transactions. Id.   The objecting party must make an initial showing that the debtor's records are inadequate. Id. at 1233.

Once the objecting party meets the initial burden of showing that the records are insufficient to ascertain the debtor's financial condition, then the burden of coming forward shifts to the debtor to provide a justification for the failure to keep the records. Id. at 1232-33; In re Wasserman, 332 B.R. 325, 331 (Bankr. N.D. Ill. 2005).  The determination of what is a justifiable explanation for the failure to keep records is based on the facts and circumstances of each case taking into account "the education, experience, and sophistication of the debtor; the volume of the debtor's business; the complexity of the debtor's business; the amount of credit extended to debtor in his business; and any other circumstances that should be considered in the interest of justice." Meridian Bank, 958 F.2d at 1231.

In this case, the Debtor was unable to furnish records for three (3) creditors.  These three debts total approximately $14,000.00 of the $51,000.00 of unsecured debt listed on Schedule F of the Debtor's bankruptcy schedules.  Complete records for other accounts going back to at least September 2006 (and to earlier dates for some accounts) were obtained and were available to Chase.  In addition, the Debtor's bank statements from May 2006 were available to Chase.

Given the relatively non-complex nature of the Debtor's economic affairs, I conclude that Chase did not meet its burden of showing by a preponderance of the evidence that the available records were inadequate to permit interested parties to ascertain the Debtor's financial condition at all relevant time periods.  See In re Splawn, 376 B.R. 747, 759 (Bankr. D.N.M. 2007); In re

Harmon, 324 B.R. 383, 389 (Bankr. M.D. Fla. 2005).  From the available records, it was possible

to review the majority of her financial transactions and discern the manner in which the Debtor

handled her financial affairs.  While not every financial transaction was available due to the

absence of the three (3) account records, Chase has not proven that the nature of the missing

records were material to the administration of the bankruptcy case.[32]

       Alternatively, in the circumstances presented here, I am satisfied that the Debtor's failure

to personally maintain copies of her account records for three (3) of her credit cards was justified

under all of the circumstances.  The CitiBank, Wells Fargo and AT&T Universal account

statements presumably were created by those three (3) creditors or their predecessors-in-interest.

Given the current state of information technology and the nature of the credit card business, it

would be fair for the Debtor to assume that, regardless of whether she maintained a set of past

statements, her account information would nonetheless still exist in electronic form and be

---

[32]     I previously observed that information from the unavailable account records was relevant
to the issue of the Debtor's intent under 11 U.S.C. §523(a)(2)(A) and (C).  See n.6, supra.  However, I
do not equate the absence of  information that may prove relevant in a creditor's dischargeabilty action
concerning an individual debt with the more fundamental debtor obligation to retain records from which
his or her "financial condition or business transactions might be ascertained" under §727(a)(3).  The use
and purpose of the information differ in the two (2) contexts.  In a §523(a)(2) proceeding, the records
may be probative and assist the court in drawing inferences from circumstantial evidence and make
findings regarding the debtor's state of mind.  In the latter context, the records are designed "to enable
creditors to learn what [the debtor] did with [the] estate."  Alan N. Resnick & Henry J. Sommer (eds.), 6
Collier on Bankruptcy ¶727-31, at 31 (15th rev. ed. 2009) (quoting Koufman v. Sheinwald, 83 F.2d 977,
980 (1st Cir. 1936)).  In other words, the mere fact that the Debtor did not maintain records that would
have been discoverable in a nondischargeability proceeding is not per se grounds for the denial of
discharge under §727(a)(3).

retrievable – at least for a reasonable period of time.[33]  The account statements are not unique

records created by the Debtor such that she should expect that, if not preserved by her, all

possible inquiry into her financial affairs would be precluded.  In these circumstances, I conclude

that the Debtor acted justifiably in relying upon the third parties to preserve the financial

information and that she should not forfeit her right to a chapter 7 discharge under §727(a)(3).


### VIII. CONCLUSION

For the reasons set forth herein, I find that: (1) the Debtor's debt to Chase is not excepted

from discharge under 11 U.S.C. §523(a)(2)(A) or (C); (2) the Debtor is not entitled to an award

of attorney's fees and costs on her counterclaim under 11 U.S.C. §523(d); and (3) the Debtor

should not be denied a chapter 7 discharge under §727(a)(3).

An Order in accordance with this Opinion will be entered.


**Date:   May 7, 2009**                    _____
                                            **ERIC L. FRANK**
                                            **U.S. BANKRUPTCY JUDGE**

---

[33]        In a sense, the situation is analogous to one which a debtor places paper records in
storage with a reputable storage company.  The trend of debtors relying on remote, electronic record
keeping by third parties is likely to grow as more businesses offer consumers the option of on-line
payments with "paperless billing."